IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 18, 2018 Session

**STATE OF TENNESSEE v. ANGELA BUCHANAN**

**Appeal from the Circuit Court for Rutherford County**
**No. F-75983  Royce Taylor, Judge**

_____

**No. M2018-00190-CCA-R3-CD**
_____

Defendant, Angela Buchanan, was indicted by the Rutherford County Grand Jury for felony murder, aggravated child abuse, and aggravated child neglect in December of 2014.  A superseding indictment, issued in August of 2016, eliminated the charge of aggravated child abuse from the indictment.  Following a jury trial, Defendant was found guilty of criminally negligent homicide as a lesser-included offense of felony murder and aggravated child neglect.  Defendant received an effective sentence of twenty-two years for the convictions.  After the denial of a motion for new trial, Defendant presents the following issues to this Court on appeal: (1) whether the trial court erred by refusing to grant a mistrial after a comment made by the prosecutor prior to jury selection; (2) whether the trial court erred by refusing to grant a mistrial after informing the jury that Defendant was charged with aggravated child abuse; (3) whether the evidence was sufficient to support the convictions; and (4) whether the trial court properly sentenced Defendant.  For the following reasons, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

John H. Baker III, Murfreesboro, Tennessee (on appeal), and William B. Bullock, Murfreesboro, Tennessee, and Judith St. Clair, Manchester, Tennessee (at trial), for the appellant, Angela Buchanan.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Jennings H. Jones, District Attorney General; and Hugh Ammerman, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

On March 20, 2014, emergency personnel responded to a 911 call from Defendant's home in Murfreesboro at around 12:30 p.m. Rutherford County EMS paramedic, Janna Petree-Chew, responded to the "CPR in progress" report. When she arrived at the home, the fire department was already on site, performing CPR on the four-month-old victim, M.C.[1] The infant was in a back bedroom on the floor when Ms. Petree-Chew arrived. A fireman "handed" her the baby who was "very cold and blue, like he had been down for a while." The victim had no pulse, was not breathing, and was cold to the touch. Ms. Petree-Chew took the victim to the ambulance where medical professionals continued CPR, "opened his airway," and took him to the hospital. There was no change on the monitor during the victim's transport to the hospital. Once they arrived at the hospital, the "E.R. staff and a doctor" continued to administer CPR until the assessment was made that further medical intervention was unnecessary. The victim was declared deceased.

Ms. Petree-Chew described the Defendant's house as "very cluttered." She explained that it was "hard to actually get into the house" because of "boxes and beds." In her opinion, "it looked like somebody was in the middle of a move." It was a "strange situation." Defendant was "sitting on the floor talking . . . really fast." She did not appear to be "crying or upset." There were several children in the home, which was being operated as a day care.

Murfreesboro Police Detective Jacob Fountain was the first officer to arrive on the scene after the fire department. He described the house as a "mess." There was food and trash everywhere. Nothing in the house was clean. There was an open bottle of pills in the bedroom. Detective Fountain had a brief conversation with Defendant during which "[s]he explained to [him] she was asleep on the bed with the child" and when "[s]he woke up, . . . the child wasn't breathing." Defendant showed Detective Fountain the bed where she and the child had been sleeping.

There were a lot of children in the house, "[f]ending for themselves." Detective Fountain said that the children were talking to him and the first responders. He wanted to "consolidate all of the kids" so that they would not disrupt the scene. "Some were sitting on the couch. One was upstairs playing a game[.]" He observed a remodeled garage portion of the house that appeared to be "set up like a small child care room." Detective Fountain described it as the "cleanest part of the house" but did not recall any children being present in the room at the time. He notified the Department of Children's Services of the incident in accordance with police protocol. Detective Fountain described the victim as "nervous."

---

[1] It is the policy of this Court to refer to minor victims by their initials.

Detective Paul Mongold of the Special Victims Unit arrived on the scene shortly before 1:00 p.m. The victim had already been transported to the hospital at that point. Once Detective Mongold was on the scene, he collected evidence and took precautions in order to preserve the scene. At that time, there were seven children at the home. Three of those children were Defendant's biological children.

Detective Mongold took pictures of the home and a recorded video statement from Defendant. In the video, Defendant walks through the home explaining the sequence of events that led to the victim's death. Defendant explained that she had been watching the victim since he was four days old. She normally took care of the victim and his brother without charging any money because she was a friend of the victim's mother. Ordinarily, Defendant watched the victim and his brother from Sunday through Wednesday.

In the video, Defendant stated that the victim's father dropped the children off that morning around 8:00 a.m. She gave the victim a bottle around 9:00 a.m. before putting him in a bouncy seat for about fifteen minutes. The victim fell asleep in the seat. Defendant fed the victim again before placing him on his back near the foot of the bed in her bedroom. Defendant rolled up a sweatshirt and placed it between the footboard and the mattress. Defendant's older son was asleep in the bed. Another child, named J.C., arrived at the house around 10:30 a.m. Defendant made lunch for the other children and fed them around 11:00 a.m. Then, Defendant put all of the children down for a nap. Defendant explained that she had to lie down with J.C. to get him to rest. Defendant put J.C. in the bed where her son and the victim were already sleeping. Defendant inadvertently fell asleep next to J.C. When she woke up, she found the victim under the covers, face down.

Detective Mongold described the home as being in "disarray." He made note of "spoiled food," "liquid hydrocodone on a dresser in the bedroom," and some Benadryl pills on the floor. In his opinion, it was a "dangerous situation" for toddlers. Detective Tannas Knox, also a member of the Special Victims Unit, assisted in the investigation. Detective Knox specifically asked Defendant if she "would test positive for anything that day." Defendant admitted that she took Suboxone and Valium, both proscribed medications, on the day of the incident.

Dr. Thomas Deering performed the autopsy of the victim. In his opinion, the victim died of asphyxia, probably due to suffocation. He explained that it did not mean that the child was "strangled" or "wedged against anything," rather that it was "a situation where [the victim] wasn't able to get enough oxygen based on the unsafe sleeping environment and probably suffocated." In other words, the victim was "unable to breathe in an unsafe sleeping condition." He noted that the victim had "chronic tracheitis with exacerbation and pneumonitis" possibly making it "more difficult for this

child to deal with that environment." He explained that trachaeitis could be caused by pollen, second-hand smoke, or exposure to allergens. Dr. Deering opined that the victim could have had a "little sickness" prior to death but that the minor inflammation that would have resulted from sickness was not the cause of the victim's death. Dr. Deering concluded that the manner of death was an "accident."

Dr. Lisa Lowe was the victim's pediatrician. She recalled talking to the victim's parents about the well-known Back to Sleep Program, an initiative of the American Pediatric Association that advocated placing children on their backs to sleep. Dr. Lowe saw the victim in her office at normal intervals for well-child visits. No significant problems were reported at the one and two month checkups, other than complaints that the infant was not always a good sleeper. Dr. Lowe noted in the records that the victim often slept with his parents in their bed. Dr. Lowe commented that she would have advised the parents against this practice.

Dr. Lowe reviewed the victim's medical history. She noted that the victim's mother called the after-hours number at the office on January 24, 2014, to report "weird" breathing after the victim woke up from his nap. The nurse who answered the call asked several questions, the answers to which did not indicate that there was a severe problem with the victim. The nurse made the recommendation that the mother take the victim to the emergency room, but the mother wanted to observe the victim to see if the problem resolved itself. The victim was never taken to the emergency room.

Dr. Lowe saw the victim about one week prior to his death. According to the medical history, the victim had gained weight, slept on his back, and was able to roll over to his stomach. The parents were concerned that the victim had gas. The parents reported that the victim was under the care of an in-home sitter.

The victim's parents testified at trial for Defendant. The victim's father admitted that he was unemployed. He acknowledged prior convictions for attempted kidnapping in 2008 and the sale of a Schedule II drug in 2016.

The victim's father explained that the victim's mother worked at Amazon and would usually leave for work around 6:00 a.m. On the day of the incident, she went to work as usual. The victim's father had been up until at least 2:00 a.m. on the night prior to the incident, drinking beer with a childhood friend who was visiting the area on business. The victim's father drove the victim and his brother to Defendant's house and dropped them off around 8:00 a.m. Defendant took several minutes to open the door but eventually came to take both of the children from the victim's father.

The victim's mother considered Defendant a friend. She asserted that Defendant was always alert and tried to help her out by watching her children. The victim's mother

explained that Defendant watched her children during the times that she worked, sometimes without getting paid. The victim's mother explained that she had worked at a different job while she was pregnant but lost her job due to a lack of work. She started working at Amazon in March, after the victim was born. She wanted Defendant to watch her children on the day of the incident even though it was not normally a day that the children went to daycare. Initially, Defendant declined. Defendant told the victim's father that she was full and that if he was home, he could watch the children. Eventually, Defendant told the victim's mother that there had been a cancellation and that she could drop the children off in the morning at her house. The victim's mother left for work that morning at around 6:00 a.m. with plans for the victim's father to take the children to Defendant's house later in the morning. At around 1:00 p.m. that afternoon, her supervisor and a security guard informed her that there had been an accident. The victim's mother called Defendant and learned that the victim was on the way to the hospital. When the victim's mother got to the hospital, she was informed that the victim was dead.

During her testimony, the victim's mother recalled a day in January when she called the Murfreesboro Medical Clinic because the victim was breathing "funny" after being picked up from daycare. She remembered the nurse told her to take the child to the emergency room if his symptoms did not improve. The victim's mother claimed that the victim's breathing improved after about twenty minutes so she did not take him in to the doctor.

Rene Cain, J.C.'s mother, confirmed that she dropped J.C. off at Defendant's house on the morning of the incident between 10:00 and 10:30 a.m. She explained that J.C. would not nap unless someone was lying down with him or standing with him.

Defendant testified at trial. Defendant explained that she had four biological children. Three of her children were home at the time of the incident. She explained that she originally operated her in-home daycare at a different location but that she moved to the house where the incident occurred in February of 2014. All of Defendant's belongings were in the house, but she had not yet unpacked everything. Defendant did not intend to begin operating the daycare at her new home but quickly got things ready when she received multiple inquiries in response to her Craigslist advertisement. Defendant explained that she converted the garage to a daycare room prior to moving in to the home. Defendant was "not licensed and never have one time . . . advertised that [she] was licensed" to operate a daycare.

Defendant testified that she started caring for the victim when he was four days old and that he spent the night at her house on more than one occasion. Later, Defendant admitted that the victim may not have come to her home during normal daycare hours until he was about six weeks old. Regardless of the victim's age at the time he started

coming to stay at the day care, Defendant insisted that the victim was coughing and wheezing when she first started watching him at her new home. She tried nasal spray, vapor rub, and a steamed shower to help the infant's breathing. According to Defendant, both of the victim's parents smoked. In late January, Defendant recalled a day where the victim was having breathing problems. Defendant asked the victim's parents to take the child to the emergency room. They declined. Defendant insisted that the victim was still having breathing problems the week of his death.

According to Defendant, she initially declined to watch the victim and his brother on March 20 because the daycare was already full that day. On the evening of March 19, when the victim's parents came to pick up their children, they were accompanied by several men. They explained that they were on their way to the bar at a bowling alley. Defendant told them that the victim's father would have to watch the children the next day because she was full. Defendant eventually told the victim's parents that they could drop the children off in the morning.

According to Defendant, the first child arrived that morning at 6:00 a.m. Another child was dropped off soon thereafter. Defendant recalled that the victim's father brought the victim and his brother around 8:30 a.m. She admitted that she did not answer the door as soon as they arrived because they were not supposed to come until later on in the day. Defendant opened the door because the victim's father continued to knock on the door and Defendant could see that both the victim and his brother were upset. Defendant testified that the victim's father "reeked" of alcohol and had blood shot eyes.

Defendant recalled feeding the children when they first arrived. The victim fell asleep in her arms and she placed the victim in his car seat. When he woke up about fifteen minutes later, she played with him for a while before putting him in a Bumbo seat and then a swing. Defendant claimed the victim fell asleep in the swing. At this point, Defendant started to prepare lunch for the other children. She made the decision to move the victim from the swing to her bed so that he would be near the kitchen rather than placing him in one of the cribs in the daycare room. Her son was already asleep in this bed. At some point, Defendant got the victim out of the bed in the bedroom, fed all of the children, and got the children ready for nap time. She did not clean the kitchen after fixing lunch.

Defendant lay down on her bed with J.C. and the victim. Before she could get J.C. to sleep, a friend stopped by the house to give Defendant a pair of jeans. She took the victim with her to greet her friend when she answered the door. When the friend left, Defendant returned to the bedroom with the victim and J.C., and all of them lay down on the bed. Defendant fell asleep with the victim and J.C. in the bed for an unspecified amount of time. The phone rang and woke her up. When she awoke, the victim was face

down on the bed and did not appear to be breathing. She called 911 and started CPR. The victim never regained consciousness.

The jury found Defendant guilty of criminally negligent homicide and aggravated child neglect. After a sentencing hearing, the trial court imposed an effective sentence of twenty-two years. Defendant filed a timely motion for new trial. After the denial of the motion, Defendant appealed.

*Analysis*

*I. Mistrial*

First, Defendant claims that the trial court erred when it failed to declare a mistrial on two separate occasions: (1) when the State made an allegedly prejudicial remark about the victim's father that was overheard by potential jurors; and (2) after instructing the jury about an aggravated child abuse charge when "no such charge was to be prosecuted at trial." Specifically, Defendant refers to the trial court's instructions both prior to the jury selection and after the jury was empaneled during which the trial court referred to a charge of aggravated child abuse—a charge that was removed from the superseding indictment. Additionally, Defendant argues that the State's comment about the "father of the dead baby" was prejudicial and warranted a mistrial. The State disagrees.

A trial court has the authority to declare a mistrial, and its decision is reviewed for an abuse of discretion. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). "'[N]ormally, a mistrial should be declared only if there is a manifest necessity for such action.'" *Id.* (quoting *State v. Saylor*, 117 S.W.3d 239, 250-51 (Tenn. 2003)). A manifest necessity exists when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial were not declared, *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000), and there is "no feasible alternative to halting the proceedings," *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). The burden is on the party seeking the mistrial to show that a manifest necessity exists. *Land*, 34 S.W.3d at 527.

A. Prosecutor's Statement

At the outset of the transcript, the following exchange occurred during a conference in chambers:

> [Counsel for Defendant]: Your honor, I respectfully make this [request for a mistrial] with [the prosecutor] here. But we were sitting there in the front row just now, and everybody on the front row could have heard

what he said. He brought up Tony Cole. And he just started saying things about we're going to wait until the father - -

[Co-counsel for Defendant]: Dead baby's father.

[Counsel for Defendant]: And she heard it. She was over there. Everybody on the front row heard it. There is no way in the world we can conduct this trial with that - - starting with the jurors.

[Trial Court]: Wait a minute. I don't know what was said.

[Prosecutor]: . . . [A]ll I said to [counsel for Defendant] was they are on their way at 9:30, 9:45, if we need to delay this jury selection so that we can sequester the dead - - father of the dead baby somewhere in the courthouse, then that's fine. That's what I said.

. . . .

[Trial Court]: I will deny the motion. I think it's clear we are talking about a murder trial. So I don't know that that's going to be prejudicial. Okay.

Factors which must be considered in determining whether improper prosecutorial conduct affected the jury verdict to the prejudice of the defendant are (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and, (5) the relative strength or weakness of the case. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). In this case, the jury had not yet been chosen. Defendant did not show that any of the potential jurors who actually ended up on the jury even heard the statement. The record contains nothing more than Defendant's speculation that the statement by the State had any effect on the members of the venire. Moreover, while the statements of the prosecutor were certainly insensitive, there was no proof of malicious intent and no question that the proof in the case involved the death of an infant. Further, Defendant failed to request a curative instruction. Therefore, we conclude that the trial court did not abuse its discretion in denying the request for a mistrial.

## B. Trial Court's Reading of the Indictment

Prior to trial, the trial court read preliminary instructions to the jury. These instructions included a charge of aggravated child abuse even though a superseding

indictment had removed this count. Defendant did not object to the reading of the indictment. Specifically, the trial court stated, "You have been summoned as prospective jurors in a criminal case involving the charges of first degree murder, aggravated child abuse, and aggravated child neglect against the Defendant[.]" After the jury was sworn, the trial court again reviewed the preliminary instructions, referencing the charge of aggravated child abuse. The trial court informed the jury that Defendant:

> has been charged by the State of Tennessee with a violation of State law. The document containing the charges is referred to as an indictment. An indictment is the formal accusation charging a defendant with a crime, and is not evidence of anything.

> The Defendant is charged with aggravated child abuse, aggravated child neglect, and first degree murder in perpetration of such crimes.

Again, Defendant did not object. The trial court continued with preliminary instructions to the jury.

At the conclusion of the instructions, the State read the superseding indictment to the jury, which did not include the aggravated child abuse charge. At this point, a bench conference was held, during which the trial court noted that "Count 3" appeared to be missing. Counsel for the State explained that there was no longer a Count 3 because there was a superseding indictment. The State offered to take "a nolle" on the aggravated child abuse charge at that time. Counsel for Defendant commented that they were unsure if they had "to do something with the instructions [because] they have already been up [on a screen for the jury to view]" and informed the trial court that they would "think about that at lunch."

After the jury left the courtroom, but prior to the lunch break, counsel for Defendant asked for a mistrial because the jury was already instructed as to the old indictment and "there [wa]s no way to correct that." The trial court denied the mistrial because none of the offenses had been "defined" for the jury at that point. After the lunch break, counsel for Defendant renewed the request for a mistrial. The trial court found that "the indictment that was read to the jurors corrected [any issue]," and therefore a mistrial was not warranted.

We note that Defendant failed to seek a mistrial after the first instance the trial court incorrectly referenced the aggravated child abuse charge in the preliminary instructions. Instead, Defendant sought relief only after the jury was sworn when the trial court again referenced the incorrect charges against Defendant. We note, however, that the indictment read by the State to the jury encompassed the correct charges. Tennessee Rule of Criminal Procedure 30(d)(1) requires the trial court to instruct the jury

"[i]mmediately after the jury is sworn . . . concerning . . . the general nature of the case, and the elementary legal principles that will govern the proceeding." The trial court then "instruct[s] the jury on the applicable law [either] before or after closing argument." Tenn. R. Crim. P. 30(d)(2). Any error in the preliminary instruction, in our view, was harmless. Defendant makes no complaint about the instructions given to the jury at the conclusion of the trial, which accurately reflected the charges as they appeared in the indictment. Thus, Defendant has failed to show a manifest necessity such that she would be entitled to a mistrial.

## II. Sufficiency of the Evidence

Defendant argues that the evidence is insufficient to support dual convictions of criminally negligent homicide and aggravated child neglect. Specifically, Defendant insists that the victim's death was "tragic and accidental" but did not rise to the "level of criminal neglect" necessary to support the conviction for criminally negligent homicide. Defendant also argues that her conduct "did not fall below a reasonableness standard of attention or supervision of the child" in order to support a conviction for aggravated child neglect. The State insists that the evidence supported both the convictions.

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). "In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973)). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or

- 10 -

circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In order to sustain a conviction for criminally negligent homicide, the State had to prove that Defendant's actions constituted criminally negligent conduct that proximately caused the victim's death. *State v. Farner*, 66 S.W.3d 188, 199 (Tenn. 2001) (citing T.C.A. § 39-13-212(a)).

> "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39-11-106(a)(4). "In other words, the accused must know, or should know, that his or her conduct, or the result of that conduct, will imperil the life of another given the circumstances that exist when the conduct takes place." *State v. Adams*, 916 S.W.2d 471, 474 (Tenn. Crim. App. 1995).

A person commits child neglect when that person "knowingly abuses or neglects a child under eighteen (18) years of age so as to adversely affect the child's health and welfare[.]" T. C.A. § 39-15-401(b). As charged in the indictment and submitted to the jury in this case, "[a] person commits the offense of . . . aggravated child neglect . . . who commits . . . child neglect, as defined in § 39-15-401(b) . . . and: (1) [t]he act of . . . neglect . . . results in serious bodily injury to the child." T.C.A. § 39-15-402(a)(1). If the victim is under the age of eight years old, aggravated child neglect is a Class A felony. T.C.A. § 39-15-402(b). Aggravated child neglect is composed of three essential elements: (1) a person must knowingly neglect a child; (2) the child's age must be within the applicable range set forth in the statute; and (3) the neglect must result in serious bodily injury to the child. Quite obviously, death is the "ultimate serious bodily injury." *State v. Christopher D. Neighbours*, No. M2000-02594-CCA-R3-CD, 2002 WL 489223, at *5 (Tenn. Crim. App. Mar. 28, 2002) (quoting *State v. Anthony Perry*, No. W1999-01370-CCA-R3-CD, 2001 WL 792627, at *6 (Tenn. Crim. App. July 13, 2001), *no perm. app. filed*)), *perm. app. denied* (Tenn. Oct. 7, 2002).

Child neglect is a nature-of-conduct offense, not a result-of-conduct offense. *State v. Ducker*, 27 S.W.3d 889, 897 (Tenn. 2000). The statute merely requires that the act of neglecting the child be committed knowingly. *Id.* For example, a defendant can be found to satisfy the mens rea for child neglect when he or she knowingly leaves a child in

a car for more than eight hours but does not satisfy the mens rea requirement if the defendant was unaware the child was in the car at the time. *Id.* After the knowing mens rea is established, then the next inquiry is whether the child suffered an adverse effect to the child's health or welfare or, in the case of aggravated child neglect, the child suffered serious bodily injury. *Id.*; *see also* T.C.A. § 39-15-402(a)(1). If the child has suffered serious bodily injury as a result of defendant's knowing neglect, then the defendant has committed aggravated child neglect, regardless of whether the defendant knew what the result of the neglect would be. *Id.*

> A defendant's mental state is a factual question for the jury to resolve. *State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010) (citations omitted). Additionally, "[o]ur jurisprudence recognizes that the mental state, a necessary factor of almost all our criminal statutes, is most often proven by circumstantial evidence, from which the trier of fact makes inferences from the attendant circumstances and from which that body weighs the circumstantial evidence." *State v. Jeffrey Antwon Burns*, No. M1999-01830-CCA-R3-CD, 2000 WL 1520261, at *3 (Tenn. Crim. App. Oct. 13, 2000)[, *perm. app. denied* (Tenn. Apr. 24, 2001)]; *see also State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000). Finally, . . . the State was not required to prove that the Defendant knew or should have known of the risk of harm posed by her conduct to any degree. *See Ducker*, 27 S.W.3d at 897.

*State v. Nicole Pamblanco*, No. M2015-01870-CCA-R3-CD, 2016 WL 6958888, at *7 (Tenn. Crim. App. Nov. 29, 2016), *perm. app. denied* (Tenn. Apr. 12, 2017).

The proof in this case, in the light most favorable to the State, established that Defendant was running an unlicensed daycare out of her home, which was both cluttered and dirty. Defendant took both Suboxone and Valium prior to being responsible for the care of at least eight children. During the time the victim was in her care, Defendant placed the placed four-month-old infant on a bed to sleep with two other children. There were blankets on the bed. Defendant herself then fell asleep on the bed for an unspecified period of time while the infant and the two other children were asleep. When she awoke to the sound of the telephone, she found the victim face down under covers. The victim was not breathing. She took the victim from the bed, and started administering CPR. A call was placed to 911. Emergency medical personnel arrived on the scene and continued CPR, but the victim never regained a pulse.

Dr. Deering testified that the child died from asphyxia, most likely due to unsafe sleeping conditions. Defendant herself admitted that she had cribs available at the house but chose to place the victim in her bed so that she could "watch him." Defendant was concerned about the victim "[b]ecause he also had been spitting up and choking." Dr.

Lowe testified that the American Pediatric Association's Back to Sleep initiative was well-known, recommending that infants under the age of one "should be in a safe, approved sleep mattress," with "a crib sheet" and "no other objects, such as a blanket or no bumper pads, no toys, and sleep alone, and then sleep on their back." Based on Defendant's own testimony, the jury could rationally infer that she acted knowingly when she took medication, placed the four-month-old victim in a bed in an unsafe sleeping environment, and fell asleep and that these acts constituted knowing neglect that resulted in the ultimate serious bodily injury, death. Moreover, the jury could have determined that Defendant's was also criminally negligent in that she should have known that her actions were a gross deviation from the standard of care and would imperil the life of the victim and that her actions were, in fact, the proximate cause of the victim's death. The evidence is sufficient to support the convictions.

### III. Sentencing

Lastly, Defendant argues that the trial court erred in sentencing by "applying an enhancing factor that was an element of the offense of child neglect." Specifically, Defendant complains about the application of enhancement factor (6): "[t]he personal injuries inflicted upon . . . the victim w[ere] particularly great." T.C.A. § 40-35-114(6). The State insists that the trial court did not abuse its discretion in sentencing Defendant.

When a defendant challenges the length or manner of service of a within-range sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707. A trial court abuses its discretion in sentencing when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). This deferential standard does not permit an appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The defendant bears the burden of proving that the sentence is improper. T.C.A. § 40-35-101, Sentencing Comm'n Cmts.

In reaching its decision, the trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing

practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. § 40-35-102, -103, -210(b); *see also Bise*, 380 S.W.3d at 697-98. Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and also "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4). The weighing of various enhancement and mitigating factors is within the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). This Court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10.

We acknowledge that the trial court relied on an enhancement factor that was an element of the offense. However, the misapplication of an enhancement or mitigating factor by the trial court "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. Moreover, the trial court also applied as an enhancement factor the fact that Defendant acted in a position of trust as the daycare provider for the victim. T.C.A. § 40-35-114(14). The application of this enhancement factor alone supports the twenty-two-year sentence imposed by the trial court. Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE